## PLYMOUTH-CANTON COMMUNITY SCHOOLS v
## STATE TENURE COMMISSION

Docket No. 83160. Argued May 1, 1989 (Calendar No. 5). Decided
    July 2, 1990. Rehearing denied *post,* 1244.

The Plymouth-Canton Community School Board suspended Scott
    Kurtz, a tenured teacher, without pay after finding that he had
    violated the district's policy regarding the use of corporal
    punishment in the restraint of a student which resulted in
    injury of the student through the use of unreasonable force,
    amounting to a breach of professional ethics. Kurtz appealed to
    the State Tenure Commission, claiming that the procedures
    adopted by the board, namely, appointing an attorney as the
    hearing officer who was a member of the same law firm as the
    attorney representing the board, denied him due process, and
    that the record did not support a finding of just and reasonable
    cause for the imposition of discipline. After taking additional
    testimony at a hearing before it, the Tenure Commission found
    that the presence of the hearing officer and the superinten-
    dent's counsel during the board's deliberations violated due
    process and that the subsequent provision of a hearing de novo
    was not adequate to remove the taint of the initial decision
    made by a biased tribunal, and ordered the teacher reinstated
    with back pay. The board sought review in the Ingham Circuit
    Court, Jack W. Warren, J., which affirmed. The Court of
    Appeals, MICHAEL J. KELLY, P.J., and HOOD, J. (E. F. OPPLIGER,
    J., concurring in part and dissenting in part), reversed and
    remanded the case to the Tenure Commission for an evaluation
    of the merits of the board's action (Docket No. 88735). Kurtz
    appeals.

In an opinion by Justice BRICKLEY, joined by Chief Justice
    RILEY and Justices LEVIN and GRIFFIN, the Supreme Court
    *held:*

The fact that the attorney who sat as the hearing officer at
    the appellant public school teacher's pretermination hearing
    before the local board of education was a member of the same
    firm as the attorney who represented the charging party did

REFERENCES

Am Jur 2d, Schools §§ 186, 189, 192.
See the Index to Annotations under Teachers and Instructors.

not deny the appellant procedural due process. Such a hearing is not a full adjudicatory hearing to which a full range of procedural safeguards attaches.

1. Tenured public employees, including the appellant, are entitled to a pretermination hearing under the Due Process Clause. Where administrative and judicial review are available, the hearing need not definitively resolve the propriety of a discharge. Rather, it should provide an initial check against mistaken decisions, i.e., whether there are reasonable grounds to believe that the charges against the teacher are true and support the proposed action. A hearing which provides notice of the charges, an explanation of the evidence, and an opportunity to respond to the charges is adequate for constitutional purposes. In this case, the appellant received more than adequate notice of the charges against him, and he took full advantage of the opportunity to testify and to confront witnesses. Thus, even assuming the existence of a right to confront witnesses, the appellant's right to procedural due process was not violated.

2. The hearing officer was not a decisionmaker. Nor was there any evidence that he had a pecuniary interest in the outcome of the hearing. Standing alone, the relationship of the attorneys was unlikely to cause the officer to favor the party represented by his professional associate or to imperil the teacher's due process rights. The decision of the Court of Appeals is affirmed and the case remanded to the Tenure Commission for review de novo on the merits.

Affirmed.

Justice CAVANAGH, joined by Justice ARCHER, dissenting, stated that the specific and identifiable financial and professional relationship between the hearing officer and counsel for the charging party raised a substantial likelihood of biased decision making. The procedure adopted by the school board deprived the teacher, confronted with the potential loss of his livelihood and his profession, of the assurance that his case would be conducted before and decided by an arbiter who was not predisposed or otherwise improperly influenced to decide against him. The potential for bias could have been avoided without undue financial or administrative burden by selecting an independent attorney to serve as hearing officer and legal advisor. By approving of the board's procedure, the majority invites abuse at the board level and disregards the purpose of the teacher tenure act of minimizing unfair treatment of tenured teachers by local boards.

Justice BOYLE concurred only in the result reached by Justice CAVANAGH.

166 Mich App 331; 419 NW2d 783 (1988) affirmed.

SCHOOLS — TENURED TEACHERS — PRETERMINATION HEARINGS.

> While pretermination hearings must be afforded public school teachers accused of misconduct, where judicial review is available, a hearing need not definitively resolve the propriety of a discharge; rather, it should provide an initial check against mistaken decisions, i.e., whether there are reasonable grounds to believe that the charges against the teacher are true and support the proposed action (MCL 38.71 *et seq.*; MSA 15.1971 *et seq.*).

*Clark, Hardy, Lewis, Pollard & Page, P.C.* (by *William G. Albertson*), for the plaintiff.

*Hiller, Hoekenga & Amberg, P.C.* (by *Daniel J. Hoekenga, Steven J. Amberg,* and *Dirk F. Zuschlag*), for defendant Kurtz.

BRICKLEY, J. This case presents the question whether procedural due process is denied a public school teacher accused of misconduct when the attorney who sits as hearing officer at the teacher's pretermination hearing before the local board of education is a member of the same law firm as the attorney representing the charging party, in this case the superintendent. We answer this question in the negative and remand this case to the State Tenure Commission for review de novo of the merits of the teacher's administrative appeal.

A teacher's pretermination hearing is not a full, adjudicatory hearing to which a full range of procedural safeguards attaches. As stated by the United States Supreme Court in *Cleveland Bd of Ed v Loudermill,* 470 US 532, 545-546; 105 S Ct 1487; 84 L Ed 2d 494 (1985), the purpose of a pretermination hearing, unlike a full post-termination adjudicatory proceeding, is not to

> definitively resolve the propriety of the discharge [but to provide] an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the

charges against the employee are true and support
the proposed action.[1]

## I

### FACTS AND PROCEEDINGS

Scott Kurtz is a tenured teacher who has been
employed by the Plymouth-Canton Community
School District since 1976. In November 1982,
while Kurtz was teaching at Central Middle
School, the superintendent of the school district
filed written charges against him, alleging that he
violated the district's policy regarding the use of
physical force in the restraint of an eleven-year-
old student. The board of education adopted a
resolution to accept the charges and to proceed in
accordance with the provisions of the teacher ten-
ure act.[2] The charges and the resolution alleged
that the inappropriate use of corporal punishment
by Kurtz amounted to reasonable and just cause
for suspension. The board provided Kurtz with a
copy of the charges, the board's resolution sus-
pending him, and a notice of hearing.

Kurtz requested a private hearing, and the hear-
ing commenced on December 15, 1982. The board
adopted a resolution[3] appointing attorney Dennis

---

[1] The dissent fails to heed the marked difference in purpose be-
tween the pre- and post-termination hearings and proceedings, errone-
ously, to analyze this case as if the conduct complained of by the
teacher had taken place at a full, adjudicatory, post-termination
proceeding.

[2] MCL 38.71 et seq.; MSA 15.1971 et seq.

[3] The resolution stated, in part:

WHEREAS, no one on the Board is an attorney or otherwise
trained in ruling on evidentiary and other issues of law that
may arise at such a hearing;

Now, THEREFORE, BE IT RESOLVED that the rules of evidence
that shall be followed in this hearing shall be those set forth in
Sections 75 through 78 of the Administrative Procedures Act
for the State of Michigan.

Pollard as hearing officer. William Albertson, a member of the same law firm as Pollard, represented the superintendent at the hearing. The president of the board of education noted on the record that the board retained the right to overrule Pollard's rulings on motions or evidentiary objections and that the board retained the exclusive authority to evaluate and judge the facts.

Kurtz objected to the procedures adopted by the board. He contended that the board's delegation of power to Pollard was excessive, in that it vested in the hearing officer the discretion to rule on procedural and evidentiary matters unless overruled by a majority vote of the board. He requested permission to conduct a voir dire examination of Pollard and moved for Pollard's disqualification because of his relationship with Albertson. He also moved to conduct voir dire examinations of members of the board and to recuse those found unable to render a fair and impartial ruling on the issues presented. In an opinion and order dated January 12, 1983, hearing officer Pollard denied the objections raised to the procedures adopted by the board, denied the motion to examine the hearing officer, and

BE IT FURTHER RESOLVED that the Board hereby names Dennis R. Pollard as its counsel during this hearing and authorizes him to make rulings of law on its behalf on any motions that may be made or filed, as well as evidentiary objections; and

BE IT FURTHER RESOLVED that the Board retains the right at all times to overrule his rulings if in its opinion the rulings are inappropriate or incorrect; and

BE IT FURTHER RESOLVED that barring a resolution so overruling him, his rulings shall be the rulings of this Board on such matters and accorded the full weight that is appropriate to this Board's ruling; and

BE IT FURTHER RESOLVED, that, notwithstanding this delegation of authority to counsel, the Board shall retain the exclusive authority to evaluate and judge the facts that may be introduced into evidence and to exercise all other duties and responsibilities as required by the nature of these proceedings.

granted, in part, the motion to examine the members of the board.[4]

During the hearing, Kurtz and several other witnesses testified regarding the incident which gave rise to the present charges. At the conclusion of the hearing, both parties submitted proposed findings of fact and conclusions of law to the board. Pollard attended the board's deliberations, answered questions posed by individual board members, and took notes, which he used to prepare a draft decision.

On February 21, 1983, the board issued its decision.[5] The board found that Kurtz initiated the physical confrontation with the student and that Kurtz made no attempt to use available alternate means, such as directing the student to leave the classroom or using the classroom telephone to request assistance. The board concluded that Kurtz violated school policy on the use of corporal punishment that amounted to a breach of profes-

[4] The motion to permit voir dire examinations of the board members indicates that criminal charges were filed against Kurtz because of the incident that led the superintendent to proceed with these charges and that the incident was the subject of a number of inflammatory and prejudicial newspaper articles published in the community. Pollard's written opinion states that "the Board of Education will allow Respondent, through his attorney, to voir dire [sic] its members. However, the scope of inquiry will be limited to permit only questions designed to uncover bias or prejudice as a result of knowledge gained outside of the present proceedings."

[5] As an introductory matter, the board stated in its decision that Pollard was present during the board's deliberations for the sole purpose of providing legal advice to the board when requested. The decision states:

Counsel was not requested, nor did he offer, any opinion or judgment as to what inferences should be drawn from the evidence, nor what discipline would be appropriate. Consistent with its resolution appointing counsel, the Board has reserved such responsibility to itself alone. Consistent with exercising that responsibility, each Board member reviewed the evidence prior to the deliberations.

sional ethics and resulted in injury to a student through the use of unreasonable force. The board suspended Kurtz without pay for the remainder of the second semester of the school year and for the first semester of the following year, with no seniority to accrue during the suspension. As a precondition to his return to employment, Kurtz was ordered to submit to a psychiatric evaluation and to present to the board a recommendation that he was psychologically fit to resume his classroom responsibilities.

Kurtz appealed to the State Tenure Commission, claiming that the procedures adopted by the board denied him due process and that the record did not support the board's finding of just and reasonable cause for the imposition of discipline. Kurtz specifically objected to the board's selection of Pollard as hearing officer due to his professional relationship with Albertson. He also objected to Pollard's attendance at the board's deliberations.

Additional testimony was taken at a hearing held before the Tenure Commission on April 25, 1983. Pollard acknowledged that the school district had been a client of his firm for several years and opined, as did Superintendent John Hoben, that the board members were aware that he and Albertson were members of the same law firm. Although Pollard did not draft the charges against Kurtz, he provided a letter of advice to the board regarding the legal ramifications of the charges and an overview of the tenure process and prepared the resolution outlining the role of the hearing officer which was later adopted by the board.

Pollard explained that, prior to the board's deliberations, board members were provided with copies of the transcripts as well as with copies of proposed findings of fact and conclusions of law

prepared by the parties. During the deliberations, Pollard took notes, discussed the charging party's burden of proof, and advised the board on legal points which arose. Pollard stated that the conclusions reached after the hearing were arrived at solely by the board. Following the board's deliberations, Pollard prepared, and the board adopted, a draft decision based on the board's findings.

The testimony of the members of the board of education was taken by deposition and submitted to the commission following the hearing. Board member Kirchgatter testified that Pollard only participated in the board's discussion when asked to clarify a point of law. Board member McClendon stated that Pollard was engaged because a competent attorney was needed to carry forth a proper hearing. He further stated that the board went through the testimony and spent a lot of time discussing the case, and that the decision drafted by Pollard was consistent with the findings made by the board and was reviewed by the board before it was adopted. McClendon testified that Pollard did not comment on the strength of the evidence or the credibility of witnesses, or suggest appropriate discipline. He concluded that "certainly the arrival at what was fact and what was not fact was purely a function and an operation of the Board of Education, and was not done by Mr. Pollard." Board member Thomas testified that while the board's deliberation was guided by a series of questions formulated by Pollard, Pollard did not participate in the discussion or resolution of those questions.

The Tenure Commission issued its decision on November 8, 1984. The commission stated that the use of counsel in a dual role had not met with unqualified approval, but that school boards are permitted to employ one counsel in a dual role in

adjudicative proceedings. The commission concluded, however, that because the board members were aware that Pollard and Albertson were members of the same law firm, Pollard's presence during the controlling board's deliberations violated due process. The commission also concluded that the subsequent provision of a hearing de novo was not adequate to remove the taint of the initial decision made by a biased tribunal and that Kurtz must be reinstated and paid all salary lost. The commission did not reach the question whether the record established just and reasonable cause to support the discipline imposed by the board.

The board of education filed a petition for review in Ingham Circuit Court. Following a hearing, the court issued a written opinion concluding that the commission's decision "that Mr. Kurtz did not receive a fair hearing was not a substantial and material error of law." The court did not address whether the evidence presented to the board supported the discipline imposed.

The Court of Appeals reversed and remanded the case to the Tenure Commission. The Court stated:

> In *Niemi v Kearsley Bd of Ed,* 103 Mich App 818, 821-823; 303 NW2d 905 (1981), the attorney who regularly served as the controlling school board's advisor represented the charging party in disciplinary proceedings before the same board. In deciding whether this practice was inherently unfair, we recognized that the attorney's dual role of representing the charging party and advising the board carried with it the potential for prejudice, but concluded that the practice was not one that violated principles of due process per se. 103 Mich App 821-822.
>
> We again decline to hold that the involvement of attorneys from the same firm in a single admin-

istrative proceeding, with one attorney acting in an advisory capacity and the other attorney acting in a representative capacity, per se constitutes a violation of due process of law. Since we find nothing in this particular record to otherwise substantiate Kurtz' claim of unfairness, we reverse the circuit court order as a matter of law. Pollard did not serve as a decisionmaker, as the controlling board retained the power to decide the case on the merits. Kurtz does not allege actual bias on the part of an individual board member or on the part of the board as a whole. There is no evidence to show that Pollard had a pecuniary interest in the outcome or is enmeshed in other matters involving the school district. [166 Mich App 331, 339; 419 NW2d 783 (1988).]

The Court remanded the case to the Tenure Commission for an evaluation of the merits of the disciplinary action taken by the board. *Id.,* pp 339-340.

We granted leave to appeal, 431 Mich 905 (1988), and now affirm the judgment of the Court of Appeals.

II

In *Loudermill, supra,* the Supreme Court held that tenured public employees must be afforded some sort of pretermination hearing. The Court then considered the qualities such a hearing must possess, given the availability of comprehensive postremoval procedures, in order to satisfy the tenured employee's right to due process.

The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. *To require more than this prior to termination* would intrude to an unwarranted extent on the govern-

ment's interest in quickly removing an unsatisfactory employee. [*Id.*, p 546. Citations omitted; emphasis supplied.]

The Court thus concluded that

*all the process* that is due is provided by a pretermination opportunity to respond, coupled with post-termination administrative procedures as provided by the Ohio statute. [*Id.*, pp 547-548. Emphasis supplied.]

The statutory scheme in Ohio, like our teacher tenure act, provided for a full post-termination administrative appeal followed by judicial review.[6] *Id.*, pp 539-540, n 6. The pretermination hearing, in such a system,

need not definitively resolve the propriety of the discharge. *It should be an initial check against mistaken decisions*—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. [*Id.*, pp 545-546. Citations omitted; emphasis supplied.]

See also *Brock v Roadway Express, Inc*, 481 US

---

[6] The teacher tenure act provides that public school teachers may be discharged or demoted "only for reasonable and just cause, and only after such charges, notice, hearing, and determination thereof, as are hereinafter provided." MCL 38.101; MSA 15.2001. MCL 38.104; MSA 15.2004 forbids demotion or dismissal except by a majority vote of school board members. The decision of the board may be appealed to the State Tenure Commission. MCL 38.121; MSA 15.2021. If the commission reverses the decision at the board level, the teacher is entitled to "all salary lost as a result of such suspension." MCL 38.103; MSA 15.2003.

De novo review before the Tenure Commission encompasses more than the mere review of the record created before the board. Commission regulations provide that a party may "appear at a hearing in person or by legal counsel and may call, examine, and cross-examine witnesses and introduce into the record documentary or other evidence." 1979 AC, R 38.172. The regulations also address evidentiary rules and require the issuance of subpoenas on request of a party. 1979 AC, R 38.172, 38.173(1).

252, 261, 263; 107 S Ct 1740; 95 L Ed 2d 239 (1987) (emphasizing that the pretermination hearing need be no more than an " 'initial check against mistaken decisions' " where expeditious review is available) (plurality opinion, Marshall, J.).

Defendant Kurtz has not demonstrated that the mere engagement of Pollard as hearing officer violated his pretermination due process rights under *Loudermill*.[7] He has not shown that because of Pollard's participation he received an inadequate explanation of the case against him, or that Pollard's evidentiary rulings were in fact so skewed in favor of the charging party that he (Kurtz) was not provided an "opportunity to present his side of the story." *Id.,* p 546. It is quite clear from the record that Kurtz received more than adequate notice of the charges against him and was provided ample opportunity to respond to those charges.

Furthermore, assuming that the *Loudermill* requirements should be expanded when factual disputes are involved in order to provide an employee with "a fair opportunity before discharge to produce contrary records or testimony, or even to confront an accuser in front of the decisionmaker . . . ," *id.,* p 553 (Brennan, J., concurring in part and dissenting in part), it cannot be denied that Kurtz took full advantage of his opportunity to testify and to confront witnesses. See also *Roadway Express, supra,* p 269 (Brennan, J., concurring in part and dissenting in part).

### III

Notwithstanding the fact that Kurtz' pretermination hearing comported with the standards set

---

[7] We assume for the sake of argument that the same process is due before an employee is temporarily suspended, like Mr. Kurtz, or permanently discharged, like Mr. Loudermill. See *Roadway Express, supra,* pp 262-265 (plurality opinion, Marshall, J.).

forth in *Loudermill,* the dissent argues that Kurtz
nevertheless was not afforded due process of law
because he was denied his "right to an impartial
decisionmaker."[8] We agree with the conclusion of
the Court of Appeals, however, that Pollard, al-
leged to be the "decisionmaker" biased against
Kurtz, was simply not a decisionmaker in this
case.

A

Uncontroverted testimony presented to the Ten-
ure Commission shows that Pollard and the board
members clearly understood that the judgment on
the charges against Kurtz was to be made by the
board alone. Kurtz has not shown that Pollard's
actions so interfered with Kurtz' ability to present
his version of the facts that the board was "not
'capable of judging [the] particular controversy
fairly on the basis of its own circumstances.' "[9] For
example, Kurtz has not demonstrated that Pol-
lard's evidentiary rulings precluded the board
from being able to fairly adjudicate the matter
before it, nor that Pollard attempted (with or
without success) to persuade the board to decide
against Kurtz. (Likewise, Kurtz does not contend
that the *statutory* requirement of the teacher
tenure act that a tenured teacher may only be
dismissed or demoted upon a majority vote of
board members[10] was in effect violated by Pollard's
overt or covert manipulation of votes.) Before the
commission, Pollard vehemently denied having
expressed an opinion to board members that the
evidence adduced at the hearing substantiated the

---

[8] *Post,* p 95.

[9] *Ferrario v Escanaba Bd of Ed,* 426 Mich 353, 376; 395 NW2d 195
(1986), quoting *Hortonville Joint School Dist No 1 v Hortonville Ed
Ass'n,* 426 US 482, 493; 96 S Ct 2308; 49 L Ed 2d 1 (1976).

[10] MCL 38.104(1)(b); MSA 15.2004(1)(b).

charges against Kurtz or that a particular penalty
was appropriate. Testimony of individual board
members also indicates the limited nature of Pol-
lard's participation.[11] In short, the picture of the
board's deliberations regarding Kurtz' case painted
by those present reveals that the board members
had studied the transcripts of the hearing, that a
lengthy discussion was held, and that Pollard's
role was narrowly circumscribed. As noted above,
the extensive record developed at the hearing
indicates that Kurtz was offered, and accepted, the
opportunity to set out his version of the incident
from which the charges arose. In sum, there is no
proof that Pollard actually participated in the
board's decision.

B

Mr. Kurtz and the dissent in effect urge us to
treat Pollard as a *constructive* decisionmaker. In
our opinion, Pollard's evidentiary and advisory
activities, standing alone, do not justify the adop-
tion of this fiction.

According to the dissent,

[t]here is simply no way to determine the extent to
which the hearing officer's participation in the
board's decision making may have influenced the
ultimate decision of the board. The deliberations of
a controlling board must be free from improper
influence by either party. Once the hearing officer
attended and participated in the board's delibera-
tions by offering legal advice, the potential for bias
was neither remote nor insubstantial.

Such a threat to the independence of the
decision-making body by an attorney with a direct
connection to the charging party does not further
fair adjudicative procedures, be they mandated by
statute or constitution, and certainly does little to

[11] See section I.

preserve the appearance of fairness. Our system of justice will not tolerate such a risk.[12]

Imputing a probability of "improper influence" to Pollard's presence, where the record not only fails to suggest such a state of affairs but plainly disproves it, might be justified on policy grounds if one could assume (1) that local boards are weak and susceptible to influence, and (2) that Machiavellian hearing officers have some strong incentive to place the actual outcome of the hearing above ethical and professional considerations and are therefore likely to abuse their positions to influence the proceedings for the benefit of the charging party represented by the officer's professional affiliate.

Regarding (1), such an assumption appears at odds with the dissent's own belief that one can expect a school board to approach impartially tenure charges which are brought by its superintendent, notwithstanding the ongoing relationship between school boards and superintendents, and notwithstanding the board's probable prior knowledge of any employment dispute which has not been resolved prior to removal proceedings.[13] The apparent inconsistency lies in the dissent's willingness to assume both that board members can remain appropriately detached from the entreaties of the very superintendent chosen by the board as its source of educational expertise and information about school related events, while at the same time assuming that the board in this case could not resist the influence of its hearing officer.

Even assuming, however that board members

---

[12] *Post,* pp 100-101.

[13] Before the Tenure Commission, Pollard referred to criminal charges which had been brought against Kurtz prior to the tenure hearing and stated that the criminal proceedings "were very much in the press locally."

are likely to be vulnerable to improper outside influence, we are not persuaded to accept assumption (2) above—that a hearing officer affiliated with the attorney representing the superintendent is likely to have sinister motives.

The dissent appears to contend that Pollard had a pecuniary interest in the *outcome* of Kurtz' hearing. The dissent suggests that there exists a clear "potential for the hearing officer's advice to the board being colored by his pecuniary interest in continuing good relations between the school board and his firm."[14] It is true, as the dissent observes,[15] that the attorneys had a pecuniary interest in *participating* in the hearing. However, this fact does not entail that the attorneys had a financial interest in a given outcome. The proposition that the hearing officer needed to aid the charging party in order to curry favor with the board itself implies that the board had already communicated to the officer an intent or disposition to rule for the charging party, thus undercutting once again the dissent's assertion that school boards can be trusted to approach tenure matters impartially. In addition, the dissent does not offer compelling reasons why "the hearing officer might have been more likely than an independent adjudicator to advise the board that the argument or evidence presented by his partner was sufficient to meet legal or factual burdens."[16]

We agree with the Court of Appeals that there is no evidence in the record to support the conclusion that Pollard had a pecuniary interest in the outcome of Kurtz' hearing.

In our opinion, the relationship between the attorneys, standing alone, is unlikely to cause the

[14] *Post,* p 100.
[15] *Post,* p 99.
[16] *Post,* p 100.

officer to favor the party represented by his professional associate or to imperil a teacher's due process rights under *Loudermill*.[17] Trained attorneys in the position of Mr. Pollard, retained to help the district avoid running afoul of the law, are no less likely to render dispassionate rulings than lay board members entertaining evidentiary requests from and considering actions taken by their hand-picked superintendent.[18] Moreover, such attorneys are, for the sake of their ongoing relationships with their clients, the school districts, unlikely to preclude teachers from presenting evidence. If evidentiary rulings deprive a teacher of the right to respond to the charges, an attorney might subject the board to liability for violating the teacher's due process rights guaranteed by *Loudermill*; and, if evidence not admitted before the school board subsequently prompts the Tenure Commission to reverse the board's decision, the attorney could render the district liable for back pay.[19]

The dissent accurately observes that the board could have selected another attorney from another law firm to serve as its hearing officer and legal advisor.[20] Its failure to do so, however, does not

[17] A different case would obviously be presented were the contested professional affiliation between the attorney for the teacher and the attorney for either the board or the charging party. Such a case could present a conflict of interest violative of an attorney's professional, ethical obligations.

[18] The dissent discounts the partiality likely to flow from the inherent relationship of trust between a school board and its superintendent while at the same time assuming that two members of the bar, with no apparent interest in the outcome of a tenure action and who are sworn to uphold the best interests of their clients, cannot be accorded the same deference.

[19] And assuming with the dissent that the attorneys' short-term financial objectives are likely to represent the strongest influence on their behavior, it should be borne in mind that the more evidence admitted by the hearing officer, the more time both he and his partner can bill the district.

[20] *Post,* p 101.

affect the constitutionality of the procedures followed at Mr. Kurtz' hearing. Although we disagree with the suggestion in the dissenting opinion that it is incumbent upon us to hypothesize a reason for the school board's choice of attorneys,[21] we observe that it is not uncommon for clients to continue business relations with attorneys who, through prior service, have gained the clients' trust and confidence.

Furthermore, we are unmoved by the fact that the same entity retained and paid both attorneys,[22] for any two attorneys representing the superintendent and the board will be appointed and paid by the same source—the school district—whether the attorneys are professional affiliates or total strangers.

In sum, the dissent has chained together several unjustified presumptions en route to the conclusion that Pollard's participation per se worked a violation of due process. The dissent has not identified any compelling reason, nor can we envision any, why Pollard should be presumed to have been financially interested in the outcome of the hearing. It has not adequately explained why Pollard should be presumed to have been a decisionmaker when the testimony at the Tenure Commission clearly shows that he was not, and, therefore, the dissent has failed to make a case that any bias whatsoever, let alone "unconstitutional" bias should be presumed in this case. Indeed, if any "bias" is likely to exist on the part of Messrs. Pollard and Albertson, it is toward their common client—the school district. Attorneys do not have clients to serve their partners; they have partners to serve their clients.

[21] *Post,* p 101.
[22] *Post,* p 99.

IV

Less than four years ago, we considered a claim by a public school teacher who challenged the procedure employed at his pretermination hearing before the school board on due process grounds. *Ferrario v Escanaba Bd of Ed,* 426 Mich 353; 395 NW2d 195 (1986).

In *Ferrario,* we determined that the plaintiff had not established a constitutional violation. Although *Ferrario* postdated *Loudermill,* we did not mention *Loudermill* in our discussion of the plaintiff's due process claim. *Loudermill* notwithstanding, we suggested that a plaintiff alleging bias on the part of the school board might establish a due process violation at the pretermination phase of a teacher tenure proceeding by showing that "the risk of unfairness was intolerably high or that the probability of unfairness is too high to be constitutionally tolerable." *Ferrario, supra,* p 380. The question just how high the *probability* of bias or unfairness must rise before a tenure hearing before the board will be deemed to have worked a violation of a teacher's right to procedural due process was not answered; *Ferrario* did not define precisely what circumstances, if any, could support such a conclusion, because the record did not substantiate Ferrario's claim of unconstitutional bias.

Because we conclude that Pollard was not a decisionmaker in this case and that, for the reasons set forth above, the risk of unfairness in Kurtz' pretermination hearing was not of constitutional magnitude, *Ferrario* is of no help to Mr. Kurtz. We therefore save for another day the question whether, and to what extent, *Loudermill* and *Ferrario* are in conflict.

V

For the reasons set forth above, we conclude that Kurtz was not deprived of his property interest in continued employment without due process of law. We affirm the decision of the Court of Appeals and remand this case to the State Tenure Commission for review of the merits de novo.

RILEY, C.J., and LEVIN and GRIFFIN, JJ., concurred with BRICKLEY, J.

CAVANAGH, J. (*dissenting*). We respectfully dissent. Defendant Kurtz was denied his right to an unbiased decisionmaker at the board hearing.[1]

I

Less than four years ago, this Court examined a challenge similar to the one before us today. In *Ferrario v Escanaba Bd of Ed*, 426 Mich 353; 395 NW2d 195 (1986), a teacher alleged that the bias of the school board presiding over his pretermination hearing denied him his constitutional right to due process. The Court assumed in that case that the constitutional right to due process of law included the right to an impartial decisionmaker at the board hearing, articulated the test to be used in determining whether the right had been violated, and applied that test. Although the Court did not specify whether the basis for that right was the United States Constitution, Michigan's Constitution, or both, it relied on cases interpreting the federal constitution.

---

[1] At the hearing, Kurtz sought voir dire of both the board members and the hearing officer for bias. The hearing officer allowed the voir dire of the board members, but refused to allow himself to be questioned. After questioning each of the seven board members present, Kurtz challenged three board members for bias. The hearing officer denied these challenges. Kurtz does not contest the hearing officer's rulings regarding the board members in this Court.

Today, despite the absence of any challenge by the parties, at any point in the history of this case, to the source or viability of the right recognized in *Ferrario* or the test adopted and applied there, the majority impliedly discards much of the reasoning in that case.

The majority finds that " 'all the process that is due' " under the federal constitution at Kurtz' pretermination hearing is defined in *Cleveland Bd of Ed v Loudermill,* 470 US 532; 105 S Ct 1487; 84 L Ed 2d 494 (1985), and includes *only* notice of charges, an explanation of the charging party's evidence, and an opportunity to respond. *Ante,* pp 78-79, 85-86. The majority concludes that *Loudermill's* requirements were met in this case before even reaching the question whether Kurtz' right to an impartial decisionmaker was denied.[2] Clearly, under the majority's opinion, the right to an impartial decisionmaker at a pretermination hearing under the tenure act, assumed in *Ferrario* to be mandated by the federal constitution, is *not* part of the federal constitution's protections. Because the majority goes on to explain why Kurtz' right to an impartial decisionmaker under *Ferrario* has not been denied, see *ante,* pp 88, 94, it may yet be prepared to recognize that the right has its source elsewhere, perhaps in the state constitution or the act itself.[3] However, the majority's earlier applica-

---

[2] *Ante,* pp 87-88. ("Notwithstanding the fact that Kurtz' pretermination hearing comported with the standards set forth in *Loudermill,* the dissent argues that Kurtz nevertheless was not afforded due process of law because he was denied his 'right to an impartial decisionmaker.' ")

[3] Although the parties in this case failed to argue an alternate basis for the right, we note that even if it were true, as the majority contends, that due process affords a tenured teacher no more than the right to appear and be heard before the local board prior to his termination, the tenure act itself grants him much more than that. Under the act, a teacher is entitled to written notice of the charges against him and at least thirty days in which to prepare a defense to

tion of *Loudermill* belies its later claim that it is not deciding in this case whether that right is preserved by the federal constitution. Part II of the majority's opinion is irreconcilable with its concluding sentence purporting to avoid the question whether federal constitutional requirements of due process under *Loudermill* conflict with the requirements of *Ferrario*.[4]

*Ferrario* was a unanimous decision of this Court, joined by the author of today's majority opinion. Without prompting by the parties, the majority now reaches out to undermine the federal constitutional roots of that case.[5] Regardless of whether

those charges, § 102, to be presented at a full, public hearing before the local board, at which the teacher has the right to representation by an attorney, § 104. At the hearing, testimony is given under oath or affirmation and the parties and the board have the right to subpoena witnesses. A full stenographic record of the proceeding is made and provided to the parties, and the written decision of the board, which must be prepared within fifteen days of the hearing, must be concurred in by a majority of the board. *Id.*

These are not the attributes of " 'an initial check against mistaken decisions.' " *Ante,* p 86 (BRICKLEY, J.). Rather, they describe a proceeding that is quasi-judicial in nature, and while the right to an impartial decisionmaker at that proceeding is not plainly provided in the statute, such a right must be implied. Such elaborate procedural safeguards prior to termination would be wholly unnecessary if the Legislature actually intended only one fair hearing, in front of the Tenure Commission, after discharge or demotion. The existence of the safeguards, therefore, clearly indicates a legislative intent to provide a fair hearing not only after, but also before, such action. As we stated in *Tomiak v Hamtramck School Dist,* 426 Mich 678, 688; 397 NW2d 770 (1986), the right to notice and a hearing before discharge or demotion is the act's "primary protection for a tenured teacher." A hearing before a biased decisionmaker, however, is no protection at all.

[4] The majority's conclusion that due process minimums are lower in the pretermination, as opposed to the post-termination, setting also conflicts with *Ferrario's* reasoning. *Ferrario* made no such distinction, relying on pre- and post-termination cases.

[5] This Court's recognition of a constitutional right to an impartial decisionmaker at a predeprivation hearing subject to de novo review extends beyond *Ferrario.* A case upon which the *Ferrario* Court relied heavily, *Crampton v Dep't of State,* 395 Mich 347; 235 NW2d 352 (1975), involved the alleged risk of bias at a predeprivation hearing involving a driver's license. Like the hearing before the school board

*Ferrario's* reasoning is still shared by a majority of the Court today, it should not be revisited without adequate briefing and argument from the parties.

We therefore agree completely that we *should* "save for another day the question whether, and to what extent, *Loudermill* and *Ferrario* are in conflict." It is unfortunate that the majority is unable to resist addressing it anyway.

II

Setting aside debate over whether it is stare decisis, the federal constitution, the state constitution, or the statute itself that requires that we apply in this case *Ferrario's* test for the right to an impartial decisionmaker at the board hearing, we dissent from the majority's conclusion that the right was not denied here.

*Ferrario* set out the test to detect the presence of impermissible bias at a board hearing. Contrary to the majority's present analysis, see *ante,* pp 88-89, we explicitly rejected the proposition that actual bias must be shown. *Ferrario, supra,* pp 379-380. Instead, we recognized that in some situations even the risk or probability of bias may be constitutionally unacceptable. *Id.,* p 380 (citing *Crampton v Dep't of State,* 395 Mich 347, 353; 235 NW2d 352 [1975]). *Crampton* stated, and *Ferrario* implied, that in some cases pecuniary interest can provide a basis for imputed bias even without a showing of actual bias. *Crampton, supra,* pp 351-352; *Ferrario, supra,* pp 374, 380. We believe the case before us is such a case.

---

under the tenure act, the hearing in *Crampton* was reviewed de novo by another decisionmaker. Yet the *Crampton* Court applied to the predeprivation hearing the constitutional standards for an impartial decisionmaker that the United States Supreme Court had enunciated for decisionmakers who are not subject to de novo review. The majority's opinion sua sponte undermines *Crampton* as well.

Testimony before the Tenure Commission established that each counsel's law firm had been employed by the local school district for many years before the present case arose. The hearing officer testified that the school district was billed monthly for the time expended by members of the firm and that the district was billed for the total number of hours he and his partner worked on this matter with no separate billing or breakdown to reflect the different roles performed by each. Because of the firm's joint billing procedure, the two attorneys were essentially both retained and paid by the local school district. The employment of both attorneys furthered their financial interests and the financial interests of their law firm.

The hearing officer was called upon to rule on procedural motions and evidentiary objections raised by an attorney with whom he had an ongoing financial and professional relationship. After the close of proofs, the hearing officer prepared an outline of the disputed factual issues for the school board to consider during the deliberations. He then attended the deliberations, answered questions on legal points, and took notes, which he used to draft the board's decision.

Although we agree with the majority that a review of the record in this case demonstrates that the hearing officer conducted himself in a professional manner with no overt bias, we are unable to conclude with any confidence that the procedure satisfied the guarantee of a fair hearing established in *Ferrario* and *Crampton.* The procedure generated both an appearance and a probability of unfairness and biased decision making that is inconsistent with the guarantee of an impartial decisionmaker, whether the basis of that guarantee be a constitution or the tenure act itself.

The majority concludes that the hearing officer

was not a decisionmaker because his participation in the deliberations and decision of the board could not have improperly influenced the outcome of the hearing. Its conclusion is apparently based on its belief that any influence the hearing officer exerted on the board's decisions could not have been improper, and, even if it was, the board was able to "resist" that influence.

In our view, the potential for the hearing officer's advice to the board being colored by his pecuniary interest in continuing good relations between the school board and his firm is obvious. For instance, the hearing officer might have been more likely than an independent adjudicator to advise the board that the argument or evidence presented by his partner was sufficient to meet legal or factual burdens.

We also disagree with the majority's suggestion that a school board should have to resist the influence of a person affiliated with counsel for one of the parties during the deliberating process. There is simply no way to determine the extent to which the hearing officer's participation in the board's decision making may have influenced the ultimate decision of the board. The deliberations of a controlling board must be free from improper influence by either party. Once the hearing officer attended and participated in the board's deliberations by offering legal advice, the potential for bias was neither remote nor insubstantial.

Such a threat to the independence of the decision-making body by an attorney with a direct connection to the charging party does not further fair adjudicative procedures, be they mandated by statute or constitution, and certainly does little to preserve the appearance of fairness.[6] Our system

---

[6] As the authors of a recent Yale Law Journal article commented,

of justice will not tolerate such a risk.[7]

Furthermore, we find it particularly significant that the board could have easily eliminated the substantial threat of bias in this case if it had selected an independent attorney from another law firm to serve as its hearing officer and legal advisor. It is difficult to imagine a legitimate reason for a local school board to prefer to select a hearing officer from the firm that represents one of the parties rather than from an independent source, and the majority fails to suggest one. If a local school board decides to hire an attorney to serve as hearing officer or legal advisor in a hearing under the tenure act, and we do not intend anything in this opinion to discourage boards from doing so,[8] that attorney should be independent of the counsel for the charging party.

"[f]ew situations more severely threaten trust in the judicial process than the perception that a litigant never had a chance because the decisionmaker may have owed the other side special favors." Redish & Marshall, *Adjudicatory independence and the values of procedural due process,* 95 Yale L J 455, 483 (1986).

[7] Cf. *In re Schlossberg,* 388 Mich 389; 200 NW2d 219 (1972). Although this case, unlike *Schlossberg,* did not come to this Court on appeal from the State Bar Grievance Board, reference to the Rules of Professional Conduct is no less appropriate.

The comment to MRPC 1.10, which concerns the imputed disqualification of attorneys, states that the "rule of imputed disqualification . . . gives effect to the principle of loyalty to the client as it applies to lawyers who practice in a law firm. Such situations can be considered from the premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated."

In view of the duty of loyalty and the premise that "a firm of lawyers is essentially one lawyer," MRPC 1.7, addressing conflicts of interest, is also relevant.

Because board counsel was employed by the board in a quasi-judicial role, Canon 3 of the Code of Judicial Conduct, which admonishes judges to perform the duties of their judicial offices impartially and diligently, also applies.

[8] See MCL 380.1253; MSA 15.41253 (authorizing the board to employ an attorney to represent the school district or board and to render other legal service for the welfare of the school district).

III

Despite our disagreement with the majority's conclusions about the teacher's claim of impermissible bias, we agree that the only remedy that can be afforded the teacher is a remand to the State Tenure Commission for review of the merits de novo. An award of back pay based on a procedural error at the board hearing before the commission determines whether the teacher was suspended for cause would be inconsistent with past precedent. See *Ferrario; Pounder v Harper Woods Bd of Ed,* 402 Mich 91; 260 NW2d 287 (1977); *Shiffer v Gibraltar Schools,* 393 Mich 190; 224 NW2d 255 (1974). Although the procedures employed by the board in the present case present an unacceptable risk of bias, there has been no determination yet by the Tenure Commission that Kurtz was arbitrarily or capriciously suspended.

A hearing de novo is adequate to remove the taint of an initial decision made by a biased tribunal. The commission has the statutory power to subpoena witnesses to take additional testimony and may make independent findings of fact. *Rehberg v Melvindale, Ecorse Twp Bd of Ed,* 345 Mich 731, 737; 77 NW2d 131 (1956). All questions of law and fact decided by the controlling board are subject to review and determination de novo, and the school district continues to bear the burden of showing reasonable and just cause for the discipline imposed. *Comstock Public Schools v Wildfong,* 92 Mich App 279, 284-285; 284 NW2d 527 (1979). If Kurtz prevails before the Tenure Commission on remand, back pay subject to mitigation under *Shiffer, supra,* is available.

IV

In this case the specific and identifiable financial

and professional relationship between the hearing
officer and counsel for the charging party raised a
substantial likelihood of biased decision making.
The procedure adopted by the school board de-
prived the teacher, confronted with the potential
loss of his livelihood and his profession, of the
assurance that his case would be conducted before
and decided by an arbiter who is not predisposed
or otherwise improperly influenced to decide
against him. The potential for bias present in this
case could have been avoided without undue finan-
cial or administrative burden by selecting an inde-
pendent attorney to serve as hearing officer and
legal advisor. By approving of the board's proce-
dure, the majority invites abuse at the board level
and disregards the act's purpose of minimizing
unfair treatment of tenured teachers by local
boards.

Consequently, we would reverse the decision of
the Court of Appeals and remand the case to the
Tenure Commission for a review de novo of the
merits.

ARCHER, J., concurred with CAVANAGH, J.

BOYLE, J., concurred only in the result reached
by CAVANAGH, J.